NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

KARI M., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, B.M., MUSCOGEE CREEK
NATION, *Appellees.*

No. 1 CA-JV 20-0389
FILED 4-29-2021

---

Appeal from the Superior Court in Maricopa County
No. JD531327
The Honorable Jeffrey A. Rueter, Judge

**VACATED AND REMANDED**

---

COUNSEL

David W. Bell Attorney at Law, Higley
By David W. Bell
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee, Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Michael J. Brown delivered the decision of the Court, in which Presiding Judge David B. Gass and Judge David D. Weinzweig joined.

---

**B R O W N**, Judge:

¶1         Kari M. ("Mother") appeals the juvenile court's order granting guardianship of her son, B.M., to his grandparents.  For the following reasons, we vacate the order and remand for further proceedings.

**BACKGROUND**

¶2         Mother has disabilities affecting her cognitive functioning, judgment, speech, and balance; she is considered a vulnerable adult by Adult Protective Services and has night blindness.  B.M. is an Indian child under the Indian Child Welfare Act ("ICWA").  After B.M.'s birth, Mother and B.M. resided with the boy's maternal grandparents ("Grandparents") for six years, and Grandparents assisted with B.M.'s care during that time.

¶3         In November 2016, Mother moved into an assisted-living home with B.M. and allowed the in-home providers to babysit B.M., which caused him to be fearful.  B.M. told Mother one of the providers would threaten and yell at him, but she continued to rely on that provider to care for the child.  Law enforcement eventually investigated, and Mother and B.M. moved back in with Grandparents.  When Mother moved out again around April 2017, Grandparents obtained temporary sole legal decision-making for B.M. through the family court.

¶4         In December 2017, B.M.'s best-interests attorney in the family court matter filed a dependency petition in the juvenile court alleging Mother was unable to independently care for B.M.  The Department of Child Safety ("DCS") then joined as a party to the petition and B.M. remained with Grandparents.

¶5         Meanwhile, Mother rented an apartment and worked at various times as a caretaker and in a classroom; she also received monthly Social Security disability payments.  DCS provided her with services, including two psychological evaluations, a neuropsychological evaluation, individual and family counseling, and a parent aide with visitation.  Mother began her parent-aide service in February 2018.  DCS referred B.M. for

individual counseling, and between April and June, B.M.'s counselor included Mother in a few family sessions. The counselor ended the sessions when they became unproductive. DCS offered no more family counseling.

¶6            In June 2018, Mother completed a psychological evaluation with Dr. Alex Levitan. During the interview, Mother said she had no close friendships and lacked a social support network. Dr. Levitan diagnosed Mother with an adjustment disorder and borderline intellectual functioning. He explained her diagnoses could affect her ability to parent by decreasing her capacity to function independently and problem-solve appropriately. Accordingly, he warned that "[i]t is vital that [Mother] is able to utilize her support systems in order to mitigate deficits in her ability to discharge [her] parental responsibilit[ies]." Dr. Levitan opined that because Mother did not appear to have social, non-professional supports available to her at that time, B.M. would be at an elevated risk of parentification and harm in her care.

¶7            In August 2018, the juvenile court found B.M. dependent after a contested hearing and set a case plan of family reunification. B.M. remained with Grandparents. That same month, Mother's parent-aide service closed successfully. She had met all but one of her program goals: articulating a protection plan for B.M. At closure, the parent aide explained that Mother "appears to know how to protect [B.M.] in the moment, but will need to further explore thinking ahead and a plan to keep [him] safe in the future." As late as February 2019, DCS reported to the juvenile court:

> Since discharging from [parent-aide] services, [Mother] has continued to learn how to plan for protection of her child as well as manage his behaviors and engage him in various activities during visits. This is evidenced by [Mother] articulating clear and appropriate plans to this [case manager] on how she would respond to safety issues with the child, including but not limited to encountering a similar situation with her DDD caregivers and child in which this case was opened with.

This paragraph was removed from subsequent DCS court reports, and DCS did not refer Mother for a second parent aide.

¶8            In October 2018, Mother fell and required some hospitalization. Her memory was temporarily affected; she did not remember what had happened, who her caregivers were, or that she had a

child. After recovering, Mother followed her caregivers' recommendations and moved into a first-level apartment in the same complex.

¶9            In November 2018, Mother completed a neuropsychological evaluation with Dr. Kelly Rodriguez. The evaluation confirmed that Mother has impairments in speech, cognitive flexibility, motor coordination, and memory. Along with Mother's previous diagnoses, Dr. Rodriguez diagnosed her with a neurodevelopmental disorder, explaining that the diagnosis affects Mother's decision-making, problem-solving, and adaptation to environmental changes. Dr. Rodriguez opined that these limitations could "potentially affect" Mother's ability to provide a safe environment for B.M. and recommended that Mother participate in counseling with a doctorate-level therapist.

¶10          In February 2019, the DCS case manager gave Mother a list of doctorate-level counselors covered by her insurance and offered to help schedule the intake appointment. Mother declined DCS's help. Instead, she sought counseling through the Family Involvement Center, which did not provide her with a doctorate-level therapist. That same month, DCS provided Mother with partially unsupervised visits, and the court ordered family counseling for Mother and Grandparents, which they pursued through the Family Involvement Center. Grandfather, however, only participated for a few weeks. In April, Mother progressed to fully unsupervised visits. In June, DCS referred Mother to Dr. Elizabeth Capps-Conkle for doctorate-level individual therapy.

¶11          In September 2019, Mother began facing financial difficulties, and in November her church paid her rent. She also completed another psychological evaluation with Dr. Rodriguez, who again reported that Mother's ability to parent could be impaired by her limitations in developing and using resources and support, cognitive flexibility, decision-making, and organization and planning. In December, Mother progressed to unsupervised overnight visits with B.M. Each time DCS increased Mother's visits, however, B.M. displayed anxiety and troublesome behaviors.

¶12          In January 2020, DCS moved to appoint Grandparents as permanent guardians of B.M. About two months later, Mother was evicted from her apartment for failure to pay rent. With assistance from the Department of Developmental Disabilities, Mother soon moved into an assisted-living facility that did not allow children. In April, the counselor providing family therapy to Mother and Grandparents ended the service because progress had stalled, and she wanted Mother and Grandmother to

address some issues individually before resuming therapy as a family. Twice between May and June 2020, Mother went to the hospital for heat exhaustion. Sometime before November, Mother again secured independent housing.

¶13 The juvenile court held a guardianship adjudication hearing over four days between June and November 2020. At the hearing, Dr. Capps-Conkle testified that Mother understood the reasons for DCS's involvement and had made a lot of progress in understanding how the dependency affected her relationship with B.M. Mother had also (1) made significant improvement in understanding and evaluating her choices in any given situation; and (2) showed "great progress" in her problem-solving skills and in utilizing coping strategies.

¶14 Dr. Capps-Conkle testified further that Mother had shown some improvement in locating and utilizing resources but still "struggle[d] with a natural support system," though she had "good insight about that and is willing to put herself out there to . . . start to create those natural supports." Ultimately, Dr. Capps-Conkle explained that Mother "always comes to sessions ready to work," "expresses insight," and overall, had "really done well in therapy." She was unaware of any significant gaps in Mother's ability to parent. During closing arguments, all the parties believed that DCS would need to prove the elements of the guardianship motion by clear and convincing evidence.

¶15 Shortly after DCS filed an amended guardianship motion that included the required ICWA allegations, the juvenile court dismissed the dependency and appointed Grandparents as B.M.'s permanent guardians. The court's order made the findings required under both ICWA and state law but did not identify the burden of proof the court applied. Mother timely appealed.[1] About a week later, the court issued its appointment order, which recited the statutory findings required by state law and by ICWA, and noted its findings were made by beyond a reasonable doubt.[2]

---

[1] Although B.M.'s father was included in the juvenile court's order granting the petition, he did not participate in any of the guardianship proceedings or appeal the juvenile court's rulings.

[2] After our initial review of the appellate briefs and the juvenile court record, we ordered the parties to provide expedited supplemental briefing addressing (1) DCS's burden of proof on its guardianship motion, given

## DISCUSSION

**¶16** As relevant here, a court may establish a permanent guardianship if the guardianship is in the child's best interests and all of the following are true:

> 1. The child has been adjudicated a dependent child. . . .
>
> 2. [T]he child has been in the custody of the prospective permanent guardian for at least nine months. . . .
>
> 3. [T]he department or agency has made reasonable efforts to reunite the parent and child and further efforts would be unproductive. . . .
>
> 4. The likelihood that the child would be adopted is remote or termination of parental rights would not be in the child's best interests.

A.R.S. § 8-871(A). A court may waive the requirement that DCS make reasonable efforts towards reunification if, *inter alia*, "[r]eunification . . . is not in the child's best interests because the parent is unwilling or unable to properly care for the child." A.R.S. § 8-871(A)(3)(b). In evaluating the potential guardianship, the court must "give primary consideration to the physical, mental and emotional needs and safety of the child." A.R.S. § 8-871(C).

**¶17** Although the moving party generally must prove the elements of a guardianship by clear and convincing evidence, when ICWA applies the movant must prove the elements beyond a reasonable doubt. A.R.S. § 8-872(G); *see also* Ariz. R.P. Juv. Ct. 63(C) ("The moving party has the burden of proving the allegations contained in the motion by . . . in the case of an Indian child, beyond a reasonable doubt."). The moving party in an ICWA case also must prove, "beyond a reasonable doubt, including testimony from a qualified expert witness, that continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage" and that DCS has made "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that those efforts have proven unsuccessful." Ariz. R.P. Juv. Ct. 63(C); 25 U.S.C. § 1912(d)-(e).

---

that B.M. is subject to ICWA, and (2) how that burden affects the outcome of this appeal.

**¶18** The record raises serious doubt whether the juvenile court held DCS to the correct burden—proof beyond a reasonable doubt—when it ruled DCS had established the requirements for a guardianship. *See* A.R.S. § 8-872(G); 25 U.S.C. § 1912(d)-(e). At the guardianship hearing, all the parties cited the clear and convincing evidence standard. Indeed, both parties concede in their supplemental briefs that they cited the incorrect burden of proof to the juvenile court. The court did not correct the parties' assertions, and its initial signed ruling, which contains specific factual findings on the state-law guardianship elements as to Mother, is silent about the burden of proof the court applied.

**¶19** Although trial judges are presumed to know and correctly apply the law, *Fuentes v. Fuentes*, 209 Ariz. 51, 58, ¶ 32 (App. 2004), the parties' reiterations of the incorrect burden and the juvenile court's failure to express the correct burden at trial or in its initial order make it impossible to conclude the result of the guardianship proceeding complied with the law. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24 (2005) ("Application of the proper standard of proof in a termination hearing is a critical component of the 'fundamentally fair procedures' necessary to satisfy due process."). To be sure, applying an incorrect burden of proof is both fundamental and prejudicial error when the correct burden imposes a heavier burden. *See State v. Escalante*, 245 Ariz. 135, 141, ¶ 20 (2018) (Fundamental and prejudicial error are present when "the error . . . so profoundly distort[s] the trial that injustice is obvious without the need to further consider prejudice."); *see also State v. Murray*, 250 Ariz. 543, 546, ¶ 1 (2021) (applying *Escalante* and holding that "prosecutor's material misstatement of the reasonable-doubt standard was both fundamental and prejudicial error because it went to the foundation of the case and deprived Defendants of an essential right").

**¶20** DCS urges us to affirm the guardianship because the juvenile court's order appointing a guardian found the guardianship elements "beyond a reasonable doubt." Although that order contains the legal conclusions required for a guardianship, it does not rectify any previous error on the burden of proof. Due process ensures the movant is held to the proper burden of proof in the first instance. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 59, ¶ 15 (App. 2015) (vacating order when juvenile court applied incorrect legal standard); *In re Maricopa Cnty. Juv. Action No. JS-4130*, 132 Ariz. 486, 488 (App. 1982) (vacating and remanding when termination proceedings occur under incorrect burden of proof). For these same reasons, we decline DCS's assertion that Mother's counsel invited the error.

**CONCLUSION**

**¶21** We vacate the guardianship order and remand to the juvenile court so it may determine whether DCS satisfied its burden to prove beyond a reasonable doubt the elements required under A.R.S. § 8-871(A), § 8-872(G), and ICWA, and if not, for further proceedings consistent with this decision. Because we vacate the guardianship order, we also vacate the order appointing a permanent guardian, which was premised on the guardianship order.



AMY M. WOOD • Clerk of the Court
FILED: AA